# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JUDICIAL WATCH, INC.,          *

      *Plaintiff*          *

      v.          *     Case No. 17-cv-2006-EH

LINDA H. LAMONE, et al.,          *

      *Defendants.*          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN E. FROSH
Attorney General of Maryland

ROBERT A. SCOTT (Fed. Bar # 24613)
ANDREA W. TRENTO (Fed. Bar # 28816)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
atrento@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile

March 11, 2019          Attorneys for the State Defendants

# TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................. 2

   The Statutory and Regulatory Scheme ..................................................... 2

      Federal Law ......................................................................................... 2

      Maryland Law ..................................................................................... 3

   Procedural History of This Lawsuit .......................................................... 6

   Statement of Undisputed Facts .................................................................. 9

      This Lawsuit Concerns the Current List of Registered Voters for
         Montgomery County. ........................................................... 9

      Voter Registration Data in Maryland Is Maintained in a Statewide
         Database Known as MDVOTERS. ...................................... 10

      MDVOTERS Contains Data for Both Registered Voters and
         Individuals Who Are Not Currently Registered. ............................. 11

      MDVOTERS Contains Certain Data for Both Registered and Non-
         Registered Individuals That Has Nothing to Do with the
         Accuracy of the List of Registered Voters. ...................... 12

      When Election Officials Process Voter Registration Transactions,
         They Make Changes to Individual Records in the
         MDVOTERS Database. .................................................... 13

      When Election Officials Process Voter Registration Transactions,
         They Do Not Use, Consult, or Review Any List of Registered
         Voters—for Montgomery County or Otherwise. ............................. 14

      When Election Officials Conduct Audits to Ensure That Voter
         Registration Transactions Are Properly Processed, They
         Isolate and Review Individual Transactions in MDVOTERS. ........ 14

In Conducting Audits, Election Officials Do Not Use, Consult, or Review Any List of Registered Voters—for Montgomery County or Otherwise. ...................................................................... 15

Four Kinds of Voter Lists, Each Providing a Different Array of Voter Information, Are Available via Maryland's Application for Voter Registration Data.................................................... 16

When Election Officials Generate a List of Registered Voters from MDVOTERS, They Create an Index That Describes Some of the Contents of the Database.......................................... 17

Plaintiff Does Not Meet the Requirements of Election Law § 3-506. ........ 18

ARGUMENT.................................................................................................... 18

I.      LEGAL STANDARD ................................................................................ 18

II.     PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE THE UNDISPUTED FACTS IT HAS OFFERED DO NOT ENTITLE IT TO JUDGMENT AS A MATTER OF LAW......... 20

        A.      Plaintiff Has Failed to Carry its Burden of Showing that the Voter List Falls Within the Scope of Section 8(i) of the NVRA.................................. 20

                1.      Plaintiff Presents No Evidence that Election Officials Consult, Review, Use, or Generate Voter Lists in Connection with Any List Maintenance or Audit Activities. ............................................... 20

                2.      That Voter Lists Are Generated from Data Residing in MDVOTERS Does Not Cure Plaintiff's Failure to Present Evidence that the Voter List is a Section 8(i) Record. .................... 23

                3.      Voter Lists are Not Section 8(i) Records as a Matter of Law.......... 25

        B.      Plaintiff Has Failed to Carry its Burden of Showing that Maryland's Modest Limitations on Access to the Voter List are Preempted by the NVRA............................................................................................... 27

III.    DEFENDANTS' CROSS-MOTION SHOULD BE GRANTED BECAUSE THE UNDISPUTED FACTS SHOW THAT PLAINTIFF IS NOT ENTITLED TO THE VOTER LIST UNDER STATE OR FEDERAL LAW. ................................................... 31

A.    Plaintiff Does Not Qualify to Obtain the Voter List Under the Provisions of State Law......................................................................... 31

B.    The Voter List is Not Covered by Section 8(i) of the NVRA as a Matter of Fact or Law................................................................. 31

C.    Even if the Voter List Were Covered by Section 8(i), Maryland's Limitations on Access to that List Are Not in Conflict with Federal Law. .......................................................................................... 32

CONCLUSION ................................................................................... 35

iii

Plaintiff Judicial Watch, Inc. ("Judicial Watch") has failed to show that the list of registered voters for Montgomery County (the "Voter List") it seeks is a "record[] concerning the implementation of programs can activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1) (a "Section 8(i) Record"), either as a matter of undisputed fact or law. And even if it had, plaintiff has failed to carry its burden of showing that the "public inspection" provision of Section 8(i) of the National Voter Registration Act (the "NVRA") preempts the Maryland statute limiting access to voter lists to "Maryland registered voter[s]." Md. Code Ann., Elec. Law § 3-506(a) (LexisNexis 2017). By contrast, the undisputed facts show that the Voter List sought by plaintiff *is not* a Section 8(i) Record, and that even if it was, Maryland's limitations on access to that list do not conflict with the "public inspection" requirement of the NVRA. For these reasons, and because there is no dispute that plaintiff otherwise does not qualify for access to the Voter List under the terms of Elec. Law § 3-506, this Court should deny plaintiff's motion for summary judgment, grant the State Defendants'[1] cross-motion for summary judgment, and award judgment to the State Defendants in this case.

---

[1] The State Defendants are Linda H. Lamone, State Administrator of Elections; David J. McManus, Jr., Chairman, Patrick J. Hogan, Vice-Chairman, and Michael R. Cogan, Kelley A. Howells, and Malcolm L. Funn, Members, Maryland State Board of Elections; and Jared DeMarinis, Public Information Officer, Maryland State Board of Elections; all sued in their official capacities. Gloria Lawlah, a former Member of the Maryland State Board of Elections (the "State Board") and defendant in this case, was substituted by Mr. Funn upon her resignation from and Mr. Funn's appointment to the State

## BACKGROUND

**The Statutory and Regulatory Scheme**

*Federal Law*

Congress enacted the NVRA in order to "increase the number of eligible citizens who register to vote" in federal elections, "enhance[ ] the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (quoting 52 U.S.C. § 20501(b)). Among other things, it forbids states from removing the name of a registrant from the official list of eligible voters except under certain circumstances, 52 U.S.C. § 20507(a)(3); and requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of "(A) the death of the registrant; or (B) a change in the residence of the registrant," *id.* § 20507(a)(4).

A state fulfills its obligation to make the "reasonable effort" required under § 20507(a)(4) by establishing a program that utilizes "change-of-address information supplied by the Postal Service" to identify registrants whose addresses may have changed, and sending these voters a "notice" consisting of "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address." *Id.* § 20507(d)(2). The notice must also indicate that if the registrant does not

---

Board, pursuant to Fed. R. Civ. P. 25(d) (public officer who is party to suit in official capacity "is automatically substituted as a party" by the officer's successor).

return the card and does not vote in either of the next two general elections for Federal office, "the registrant's name will be removed from the list of eligible voters." *Id.* § 20507(d)(2)(A).

Finally, as relevant here, the NVRA requires states to "maintain for at least 2 years" and to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i)(1) (hereinafter "Section 8(i) Records"). The statute exempts from this disclosure requirement records that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." *Id.* The statute also specifies that these records "shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice." *Id.* § 20507(i)(2).

A person "aggrieved by a violation" of the NVRA "may provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). If the violation is not corrected within 90 days after such notice is given, the aggrieved person "may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." *Id.* § 20510(b)(2).

### *Maryland Law*

Maryland has implemented its obligations under the NVRA by statute and regulation. It "conduct[s] a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of the

3

registrant's death or change of residence, 52 U.S.C. § 20507(a)(4), that incorporates the "notice" procedures set forth in § 20507(d), *see* Elec. Law §§ 3-501 through 3-504 (Lexis Nexis 2017 & 2018 Supp.); Code Md. Regs. ("COMAR") 33.05.06 through 33.05.07. Specifically, Maryland law provides that an election director may not remove a voter from the statewide voter registration list except (1) at the request of the voter, (2) upon determining that the voter is not eligible or is deceased, (3) upon determining that the voter has moved outside the State, or (4) in accordance with the administrative process for challenging voter registration determinations.   Elec. Law § 3-501(1) – (4) (LexisNexis 2017).   It then establishes procedures pursuant to which the determinations in §§ 3-501(2) and (3) may be made, specifying when such determinations may be made without resort to a confirmation process,[2] when a fourteen-day confirmation notice is required,[3] and when the two-election confirmation notice prescribed by federal law is required.[4]   Maryland law

---

[2] *See* Elec. Law § 3-504(a)(1)(i) (LexisNexis Supp. 2018); COMAR 33.05.06.05A (local board may remove registrant from list of registered voters upon receipt of information from the Maryland Department of Health or the official vital statistics agency of another state or territory that voter is deceased).

[3] *See* Elec. Law §§ 3-504(a)(3), 3-504(c)(2) (local board may remove registrant from list of registered voters upon receipt of information from the United States Social Security Administration that voter is deceased, after providing 14 days' notice to the voter); COMAR 33.05.06.06 (local board may remove registrant from list of registered voters upon receipt of information from jury commissioner or clerk of court that the voter is deceased or has self-identified as a non-citizen, after providing 14 days' notice to the voter).

[4] *See* Elec. Law § 3-502(c) (LexisNexis 2017) (local board may remove registrant from list of registered voters upon receipt of information from the U.S. Postal Service that a voter has moved out of State, after sending notice to the voter and in the absence of a response from the voter, other voter registration or voting activity over the period

4

also allows the State Board to "enter into agreements with other states to exchange any data that the State Administrator determines is relevant to maintaining accurate voter registration lists."  Elec. Law § 3-101 (LexisNexis 2017).

Maryland's public inspection obligations under § 20507(i) are codified at Election Law § 3-505, which provides that "[v]oter registration records stored and retained in a local board office shall be open to public inspection," and that "local boards shall maintain for at least 2 years all records concerning programs to ensure the accuracy and currency of the statewide voter registration list."  Elec. Law §§ 3-505(b)(1), (c)(1) (LexisNexis 2017).  These records are available to the public pursuant to Maryland's Public Information Act ("MPIA"), Md. Code Ann., Gen. Prov. § 4-101 (LexisNexis Supp. 2018); *see* Elec. Law § 3-505(c)(2).[5]  Maryland also makes the State's list of registered voters available to "Maryland registered voter[s] on receipt of" a written application and "a statement, signed

---

encompassed by the subsequent two general elections); COMAR 33.05.06.06D (same where the information is received from the jury commissioner or clerk of court).

[5] As under the NVRA, "records concerning a declination to register or the identity of a voter registration agency" are not accessible to the public under Maryland law.  Elec. Law § 3-505(c)(2).  In addition, the "residence addresses, telephone numbers, and email addresses" of participants in the State's address confidentiality program may not be disclosed.  COMAR 33.04.02.02A; *see* Elec. Law § 3-506(a)(2)(v).  Nor may sensitive personally identifiable information such as social security numbers, *see* Gen. Prov. § 4-334 (LexisNexis Supp. 2018), or an individual's name combined with his or her driver's license number, *see id.* § 4-301 (LexisNexis Supp. 2018) (public inspection not permitted if the information is "by law, . . . privileged or confidential"); *see also* State of Maryland Information Security Policy, at 8 (Feb. 2013), *available at https://doit.maryland.gov/Publications/DoITSecurityPolicy.pdf* (last visited Mar. 11, 2019).

under oath, that the list is not intended to be used for . . . [c]ommercial solicitation; or . . . [a]ny other purpose not related to the electoral process." *Id.* § 3-506(a).  Applicants may request that the list be provided on certain media, that only certain information be included in the list, that the list be sorted in a certain way, or that the list be limited by party, gender, inactive/active status, or geography.  COMAR 33.03.02.03C; *see* Elec. Law § 3-506(a)(2) (authorizing the State Administrator to "adopt regulations that specify" these details).  The State Administrator is authorized to set "[r]easonable fees" for preparing a list of registered voters which the relevant custodian "may waive or reduce . . . if, after considering the applicant's ability to pay and other relevant factors, the custodian determines that the waiver or reduction is in the public interest."  COMAR 33.03.02.06A, 33.03.02.06C.

**Procedural History of This Lawsuit**

On April 11, 2017, plaintiff sent a letter to the State Board and the Montgomery County Board of Elections alleging several violations of the NVRA relating to the State's obligations to remove ineligible voters from its list of registered voters.  *See generally* Compl. Ex. A (Dkt. No. 1-1) (the "April 11 Letter").  Plaintiff also demanded the production of  "all pertinent records concerning 'the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency' of Maryland's official eligible voter lists during the past two years," including (among other things) "[c]opies of the most recent voter registration database from Montgomery County, Maryland, including fields indicating name, date of birth, home address, most recent voter activity, and active or inactive status."  *Id.* at 4.  On July 7, 2017, Jared DeMarinis, the State Board's Public Information Act officer, notified plaintiff by email that most of the

6

materials requested in the April 11 Letter were "ready for review" but that "the request for the Montgomery County voter registration list was not made in accordance with Election Law Article 3-506" and would therefore "not be processed."  Compl. Ex. B (Dkt. No. 1-2).

On July 18, 2017, plaintiff filed this suit for declaratory and injunctive relief, alleging that the "[Montgomery County] voter registration list requested by Judicial Watch is a record covered by Section 8(i) of the NVRA [*i.e.* 52 U.S.C. § 20507(i)]," Compl. ¶ 28, and that the prerequisites imposed by Maryland law for obtaining such lists—including the "written application," the swearing of an oath, that the State Board has any authority to regulate access to or the fields included with such lists, and that the State Board is authorized to impose a fee for "*providing* a list (rather than merely a *reasonable* fee for *copying* a list)," Compl. ¶ 32—are in conflict with and therefore preempted by the broad "public inspection" requirement of the NVRA, *id.* ¶¶ 33-37.[6]

On September 14, 2017, the State Defendants filed a motion to dismiss the complaint or, in the alternative, for summary judgment, contending that the plain language of the NVRA requires only disclosure of records concerning "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i), and not the voter lists themselves.

---

[6] The Complaint named as defendants both the State Defendants and the individual members of the Montgomery County Board of Elections in their official capacities.  *See* Compl. ¶¶ 6-10.  This Court dismissed the claim against the Montgomery County defendants on the ground that there was no allegation that pre-suit demand had been properly made on those defendants.  *See* Mem. Op. (Dkt. No. 34), at 30.

*See* Mem. of Law in Support of State Defs.' Mot. to Dismiss Pl.'s Compl. or, in the Alternative, for Summ. J. 9 (Dkt. No. 9-1).  Therefore, there was no conflict between state and federal law, and thus Maryland law regulating access to Maryland voter lists was not preempted.  *See id.* at 14.

On June 4, 2018, the Court denied the State Defendants' motion.  *See* Mem. Op. 26-27 (Dkt. No. 34).  Initially, the Court noted that it was "not entirely clear" whether plaintiff was seeking a "voter registration database" or "voter registration list."  *Id.* at 23, 23-24. Nevertheless, drawing all inferences in favor of plaintiff, the Court "assume[d] that the Montgomery County voter registration database is equivalent to the voter registration lists referred to in the Complaint," and proceeded to evaluate whether plaintiff had stated a claim that the "voter registration database falls within the disclosure requirements of NVRA § 8(i)(1)."  *Id.* at 25.  The Court concluded that it was "plausible that the process of reviewing the Montgomery County voter registration 'database' is a 'specific task' that is 'carried out' by 'election officials' in the service of maintaining the County's voter rolls," *id.* at 26 (quoting *Long*, 682 F. 3d at 255).  The Court also found that it was "reasonable to infer that the process of maintaining the Montgomery County voter registration database helps to assure that the information as to the voter lists is current and accurate."  *Id.*  Finally, the Court noted that "the requested database may contain records concerning the implementation of programs and activities conducted for the purpose of maintaining accurate and current voter lists."  *Id.*  Accordingly, the Court denied the State Defendants' motion, and discovery ensued.

**Statement of Undisputed Facts**

**This Lawsuit Concerns the Current List of Registered Voters for Montgomery County.**

On April 11, 2017, plaintiff requested "[c]opies of the most recent voter registration database from Montgomery County, Maryland, including fields indicating name, date of birth, home address, most recent voter activity, and active or inactive status." Compl. Ex. 1 (Dkt. No. 1-1), at 4. However, the State Board does not maintain a "voter registration database" consisting solely of Montgomery County voters, nor is it aware of any such database maintained by Montgomery County. Nov. 28, 2018 Dep. Tr. of Janet Smith (the "Smith Dep. Tr.") 77:3-7 (attached as Ex. C to the Declaration of Andrea W. Trento (the "Trento Decl.")); Decl. of Mary C. Wagner (the "Wagner Decl.") ¶ 4. Moreover, the information requested by plaintiff included a request for the voter's "active or inactive [registration] status," information that would be associated only with registered voters. Wagner Decl. ¶ 5. Accordingly, the State Board interpreted the request to seek a list of registered voters for Montgomery County, and denied the request in light of the request's failure to conform to the requirements of Elec. Law § 5-506. *See* Compl. Ex. 2 (Dkt. No. 1-2); Wagner Decl. ¶ 6. Plaintiff did not dispute this characterization of its initial request, nor did it subsequently clarify its request that it was seeking production of a "database" and not a list of registered voters containing the requested information. Decl. of Jared DeMarinis ¶ 5. Instead, it filed this action, seeking declaratory and injunctive relief requiring the defendants to produce to plaintiff "the requested voter registration list." Compl. prayer for relief ¶ 1.

**Voter Registration Data in Maryland Is Maintained in a Statewide Database Known as MDVOTERS.**

The State Board maintains Maryland voter registration data in a statewide database known as MDVOTERS. Smith Dep. Tr. 14:6-12, 23:4-9, 25:10-18, 28:17-29:2. The State Board does not maintain any separate, county-specific database containing such data, and is not aware of the existence of any such database maintained by a local board of elections. Smith Dep. Tr. 31:5-18, 77:3-7.

MDVOTERS first came online in December 2005. *See* Oct. 12, 2018 Rule 30(b)(6) Dep. Tr. of Mary C. Wagner (the "Wagner Dep. Tr.") 46:1-2 (attached as Ex. B to the "Trento Decl."). The data it contains is organized by person, with each entry containing (among other things) coded fields regarding the personal information for the individual, the individual's current registration status, the reason for the most recent change in status, and the source of the change, as well as scanned documents reflecting all voter registration transactions and certain other transactions in the individual's history. Wagner Decl. ¶ 7. For each entry, the database also contains an activity log which documents every separate voter registration transaction in the record. Smith Dep. Tr. ¶ 70:13-71:3. It has records of all voter registration transactions dating back to its introduction in 2005, as well as the records of voters who were registered at the time of its introduction, which were imported into MDVOTERS at that time from the legacy system. Wagner Decl. ¶ 9. When a person's record is updated as a result of a voter registration or other transaction, any document evidencing that transaction (*e.g.*, voter registration application), is scanned into the database and associated with that record. Smith Dep. Tr. 70:13-71:3; Wagner Decl. ¶ 15.

10

MDVOTERS is also equipped with a "list maintenance" function, by which election officials can audit voter registration transactions to ensure that they have been processed properly.  Smith Dep. Tr. 53:17-57:11.

> **MDVOTERS Contains Data for Both Registered Voters and Individuals Who Are Not Currently Registered.**

MDVOTERS contains entries for each currently registered voter, active or inactive, in the state of Maryland.  Wagner Dep. Tr. 26:17-21.  It also contains entries for individuals whose registrations have been cancelled, and for individuals whose registrations are pending or incomplete.  *See* Defs.' 2d Supp. & Am. Answers to Pl.'s 2d Set of Interrogs. 7 ("Defs.' 2d Interrog. Resps.") (attached as Ex. A to the Trento Decl.); Wagner Decl. ¶ 9. Registrations are "cancelled" at the request of an individual, upon verification of the death of an individual, when an individual is determined to no longer be eligible to vote in Maryland, or if the individual failed to return a "confirmation notice" prescribed by Md. Ann. Code, Elec. Law § 5-302(c) and did not vote in either of the two successive federal general elections following the mailing of that notice.  Wagner Decl. ¶ 10.  Registrations are "pending" or "incomplete" when an individual's application has not been accepted due to questions about the information provided in the application, or when an individual has not submitted all of the required information in connection with an application.  *See* Defs.' 2d Interrog. Resps. 7; Wagner Decl. ¶ 11.

**MDVOTERS Contains Certain Data for Both Registered and Non-Registered Individuals That Has Nothing to Do with the Accuracy of the List of Registered Voters.**

In addition to voter registration records, MDVOTERS contains records that—for the vast majority of registrants—have nothing to do with voter registration or the accuracy of the list of registered voters. Specifically, MDVOTERS contains records relating to an individual's voting history, absentee ballot application history, and petition signing history. Smith Dep. Tr. 71:11-14; Wagner Decl. ¶ 12. Except with regard to inactive voters, voting history does not bear on the accuracy of the list of registered voters.[7] Wagner Decl. ¶ 12. And while absentee ballot applications and petition entries may be used to update address information or restore a voter to active status, *see* Elec. Law §§ 3-503(b)(2), 3-503(b)(b)(4) (LexisNexis 2017); COMAR 33.05.06.04, 33.11.02.06, for most voters the application for an absentee ballot or the signing of a petition will not bear on the accuracy of the list of registered voters. Wagner Decl. ¶ 12.

MDVOTERS also contains election worker and candidacy modules for voters that, respectively, volunteer as election judges or file candidacy papers to run for election. Wagner Decl. ¶ 13. Certificates of candidacy may be used to update address information or restore a voter to active status, *see* Elec. Law § 3-503(b)(3), but there is no similar provision for election judge applications. Moreover, both the election worker and

---

[7] Voters become "inactive" when they "fail[] to respond to a confirmation notice." Elec. Law § 3-503(a). "An inactive voter who fails to vote in an election in the period ending with the second general election shall be removed from the statewide voter registration list." *Id.* § 3-503(c).

candidacy modules contain substantially more information—for example, the election worker module contains information such as job assignment (poll book judge, chief judge, scanning unit judge, provisional judge), location (precinct/early voting center), training information, and payroll information—that is wholly unrelated to the accuracy of any voter list.  Wagner Decl. ¶ 13.

Finally, MDVOTERS includes certain personal information such as e-mail addresses and telephone numbers that is not used to verify the identity of a voter or confirm the accuracy of a voter registration list.  Wagner Decl. ¶ 12.

### When Election Officials Process Voter Registration Transactions, They Make Changes to Individual Records in the MDVOTERS Database.

Most voter registration transactions are processed by local boards of elections. Wagner Dep. Tr. 16:20-17:13, 73:14-74:2.  The State Board provides training to local boards regarding proper list maintenance procedures, circulates biweekly newsletters containing important registration-related information and updates, and publishes guidance documents directing election officials how to process records that present certain scenarios. Smith Dep. Tr. 12:11-14:5; Wagner Decl. ¶ 15.  The State Board may also update records in MDVOTERS on an ad hoc basis, or where local boards require assistance due to the volume of transactions to process.  Wagner Decl. ¶ 15.

When an election official processes voter registration transactions, the official makes changes to individual records on a record-by-record basis.  *See* Wagner Dep. Tr. 73:14-74:2 ("MDVOTERS compiles individual records that the local boards do list maintenance within that record. . . .  Each individual record that's contained in

MDVOTERS needs to be touched."); Wagner Decl. ¶ 16.  In the case of processing new voter registration applications or other records received directly by the local board, this entails creating and populating a new entry in MDVOTERS containing the relevant information (or updating the information in an existing record).  Wagner Decl. ¶¶ 16-17. In the case of processing mail returned from the U.S. Postal Service as undeliverable, this entails initiating the confirmation mailing process as to a particular registrant, and making changes to that registrant's entry as dictated by guidance documents published by the State Board.  *See id.*; Smith Dep. Tr. 23:16-24:9, 32:3-10.  In the case of processing data that is uploaded directly into MDVOTERS and distributed to local boards for processing, *see, e.g.*, Smith Dep. Tr. 22:7-18, this entails reviewing and accepting updates that have already been matched to individual records within the database.  Wagner Decl. ¶¶ 16-17.  All pertinent documents associated with these transactions are scanned into the database and associated with the proper records.  *See id.*

> **When Election Officials Process Voter Registration Transactions, They Do Not Use, Consult, or Review Any List of Registered Voters—for Montgomery County or Otherwise.**

In updating individual records within MDVOTERS, election officials do not consult, review or utilize any list of registered voters, whether for Montgomery or the State as a whole.  Wagner Decl. ¶ 18.  Nor in updating such records do election officials consult, review, or utilize the subset of records in MDVOTERS consisting solely of all registered voters, whether for Montgomery County or the State as a whole.  *See id.*

> **When Election Officials Conduct Audits to Ensure That Voter Registration Transactions Are Properly Processed, They Isolate and Review Individual Transactions in MDVOTERS.**

14

The State Board conducts audits of voter registration transactions processed by local boards.  Smith Dep. Tr. 53:17-54:8; Wagner Dep. Tr. 65:7-20.  These audits are performed by Janet Smith, the State Board's Voter Registration Manager of Audits, Smith Dep. Tr. 6:2-13, 53:17-54:8, and are conducted by county and by category of transaction.  Smith Decl. ¶ 3.  Thus, for example, Ms. Smith may conduct a county-by-county audit of cancellation transactions, and report her findings on an "MDVOTERS Audit and Oversight Summary Report."  *See* Smith Dep. Tr. 52:17-55:13; Smith Decl. ¶ 3.  Local boards of election also conduct similar audits of the voter registration transactions processed by other local boards of election.  Smith Decl. ¶ 6.

When an election official conducts one of these audits, she queries the database for the category of transactions she is auditing (*e.g.* cancellations) within the jurisdiction that is being audited.  Smith Decl. ¶ 4.  The sample that is ultimately selected for auditing is based on the total number of transactions yielded by the query: 10 transactions are audited for a universe of less than 200 total transactions, 20 transactions are audited for a universe of between 201 and 400 transactions, and 30 transactions are audited for a universe of 401 transactions or greater.  Smith Dep. Tr. 68:12-69:4; Smith Decl. ¶ 4.  The auditor then checks each of the processed transactions against the scanned source document to make sure that the transaction was processed properly.  Smith Decl. ¶ 4.

### In Conducting Audits, Election Officials Do Not Use, Consult, or Review Any List of Registered Voters—for Montgomery County or Otherwise.

In conducting audits of voter registration transactions processed by local boards of elections, election officials do not consult, review or utilize any list of registered voters,

whether for Montgomery or any other county or for the State as a whole.  Smith Decl. ¶ 5.

Nor in conducting such audits do election officials consult, review, or utilize the subset of

records in the MDVOTERS database consisting of all registered voters, whether for

Montgomery or any other county or for the State as a whole.  *Id.*

> **Four Kinds of Voter Lists, Each Providing a Different Array of Voter Information, Are Available via Maryland's Application for Voter Registration Data.**

A list of registered voters is available via Maryland's Application for Voter

Registration Data (the "Application") (attached as Ex. D to the Trento Decl.).   The

Application allows qualified individuals to select the "region of data needed" (statewide,

single county, or single district), the "type of voters to include on the list" (all registered

voters, all active voters, voters who were registered within a specified date range, and/or

voters of a specific party), and the "delivery method" (by FTP for electronic delivery, or

CD for "pick up" or delivery by "mail to applicant" or "mail to organization").  *See id.*

The Application also provides for the selection of four kinds of voter lists: a

"walking list," an "absentee applicants list," an "early voting list," and a "registered voter

list."  *Id.*  The walking list is sorted by street address and provides the name and party

affiliation of each voter at each address.  *Id.* at 2.  The registered voter list contains a list

of registered voters with name, party, gender, residential address, mailing address, status

(active or inactive), state and county registration dates, split and precinct, congressional

district, legislative district, councilmanic district, ward, municipal district, commissioner

district and county for each listed voter.  *Id.* at 2.  The absentee applicants list and early

voting list contain similar information, but are limited respectively to absentee ballot

applicants and early voting participants for the specified elections. *Id.* Applicants may also elect to include the voting history for up to ten elections, primary and/or general, for each listed voter, either included in the voter list itself or as a standalone separate file. *Id.* at 1-2. The fee for obtaining a voter list is $125 of a statewide list, and $75 for a single county or single district list, plus $3 if the list is requested on CD. *Id.* at 1.

The State Board has chosen not to include voters' "date of birth" as a field in voter lists provided to members of the public due to privacy concerns. *See* Wagner Decl. ¶ 19. Specifically, the disclosure of date of birth in conjunction with a person's name enhances the risk of identity theft. *See id*.

### When Election Officials Generate a List of Registered Voters from MDVOTERS, They Create an Index That Describes Some of the Contents of the Database.

When election officials generate a list of registered voters in response to an application for voter registration data, they query the MDVOTERS database for all registered voters (active and active) in the jurisdiction sought, select *certain* of the data fields associated with the retrieved records for output into the requested list, and then generate the list. Smith Decl. ¶ 7. The list is only a partial description of the contents of the database for each of the retrieved records; the database contains more information for each registered voter than is reflected on the voter list. *See id*. For example, the voter list does not include images of the source documents supporting each voter registration transaction that has been processed in MDVOTERS. *Id.* The voter list does not include the activity log and other coded fields that are included with each entry in the database. *Id.*

The voter list acts as an index that describes some of the contents of database, but does not constitute the contents of the database for each of the retrieved entries. *Id.*

There are over 4,200,000 registered voters in the State of Maryland. Defs.' 2d Interrog. Resps. 7-8 (active plus inactive). A statewide registered voter list is provided as an electronic text file which, if printed, would comprise over 120,000 pages. Smith Decl. ¶ 8.

The State Board does not as a general matter generate and retain voter lists from MDVOTERS—either for the State as a whole or for Montgomery County in particular— except in response to specific requests for registration data. *Id.* ¶ 9. In addition, a current list can only be generated as of the time a query is performed; it is impossible to generate a complete and accurate list of registered voters as of a specific historical date and time. *Id.* ¶ 10.

**Plaintiff Does Not Meet the Requirements of Election Law § 3-506.**

Plaintiff is a corporation and thus does not, and cannot ever, meet the prerequisite for obtaining a Maryland registered voter list of being a "Maryland registered voter." Elec. Law § 3-506(a)(1); Compl. ¶¶ 5, 24.

## ARGUMENT

### I.   LEGAL STANDARD

Summary Judgment should be granted "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original). An issue is genuine and a fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322-24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where, as here, there are cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and in considering each motion "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted). When cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

19

II.    **PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE THE UNDISPUTED FACTS IT HAS OFFERED DO NOT ENTITLE IT TO JUDGMENT AS A MATTER OF LAW.**

    A.    **Plaintiff Has Failed to Carry its Burden of Showing that the Voter List Falls Within the Scope of Section 8(i) of the NVRA.**

Plaintiff's Motion should be denied, first and foremost, because plaintiff's proposed undisputed facts do not entitle them to relief.  Specifically, it was plaintiff's burden under Rule 56 to adduce undisputed facts establishing that the Voter List is a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of" Montgomery County's "official list[] of registered voters."  52 U.S.C. § 20507(i).  Plaintiff's Motion fails this test.

        1.    **Plaintiff Presents No Evidence that Election Officials Consult, Review, Use, or Generate Voter Lists in Connection with Any List Maintenance or Audit Activities.**

The NVRA's public inspection provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Long*, 682 F. 3d at 335.  To that end, a state must provide access to records that "relate to fulfilling, performing, carrying out, or putting into effect by means of a definite plan or procedure (1) systems or (2) specific actions to ensure that the State's official list of individuals entitled to vote is current and accurate." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1338 (N. D. Ga. 2016) ("*Kemp*"); *accord Long*, 682 F. 3d at 335-36 (concluding that "the process of reviewing voter registration applications is a 'program' and 'activity'" that "is plainly 'conducted for the purpose of ensuring the

accuracy and currency of official lists of eligible voters," and that the applications themselves were "clearly 'records concerning the implementation of' this 'program[] and activit[y]'").

Plaintiff's undisputed facts do not establish that the Voter List meets this standard. Plaintiff asserts that MDVOTERS *contains* records such as "information about voters who were sent Confirmation Notices" or "information concerning registration cancellations" that are encompassed by Section 8(i), *see* Pl.'s Mem. 8-10, 14-15, and that MDVOTERS also *contains* the information from which registered voter lists are generated, *see* Pl.'s Mem. 1-2, 12-13, 15-18. But the conclusion that the Voter List *therefore* is encompassed by Section 8(i) does not follow.

For one, Plaintiff has not adduced any evidence that election officials consult, review, generate or utilize registered voter lists at all when they make updates or conduct audits on records in MDVOTERS. In *Long*, the Fourth Circuit concluded that voter registration applications constituted Section 8(i) Records because they were "records" that were "evaluat[ed]" as part of a "program and activity" that was "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 682 F. 3d at 335-36. In *Kemp*, the court assessed whether thirteen specific kinds of records stored in the State of Georgia's voter registration database "relat[ed] to fulfilling, performing, carrying out, or putting into effect by means of a definite plan or procedure (1) systems or (2) specific actions to ensure that the State's official list of individuals entitled to vote is current

and accurate," 208 F. Supp. 3d at 1338, in evaluating a claim under Section 8(i).  Plaintiff has not attempted any similar showing as to the requested Voter List here.[8]

Even in this matter, the Court denied defendant's motion to dismiss because, drawing all inferences in favor of the plaintiff and assuming that the requested Voter List was equivalent to a (non-existent) Montgomery County "database," it found that it was "plausible that the process of reviewing the Montgomery County voter registration 'database' is a 'specific task' that is 'carried out' by 'election officials' in the service of maintaining the County's voter rolls," Dkt. No. 34, at 26 (quoting *Long*, 682 F. 3d at 255), and that it was "reasonable to infer that the process of maintaining the Montgomery County voter registration database helps to assure that the information as to the voter lists is current and accurate."  *Id.*  But the record is now clear that the subject matter of this case has only ever been the Voter List (and not a Montgomery County database), and plaintiff has made no effort to show that election officials review the Voter List as a "specific task" carried out "in the service of maintaining the County's voter rolls," or are engaged in a "process of maintaining" the Voter List "to assure that the information as to the voter lists is current and accurate."  *Id.*[9]  The fact that a voter list could hypothetically be used to "help[] to

---

[8] Plaintiff relies heavily on the "analysis" in *True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S. D. Miss. 2014), *see* Pl.'s Mem. 15, but in that case, unlike here, there was "no live controversy regarding disclosure of the Voter Roll," which had already been provided to the plaintiff.  *True the Vote*, 43 F. Supp. 3d at 723-24.

[9] In fact, as set forth below, the undisputed evidence shows just the opposite. Election officials *do not* consult, review or utilize the Voter List in updating, auditing or maintaining the records in MDVOTERS for Montgomery County registrants.  *See infra* § III.B.

identify duplicate registrations" or "the total number and percentage of inactive registrations," Pl.'s Mem. 17, does not transform the list into Section 8(i) Record.

### 2. That Voter Lists Are Generated from Data Residing in MDVOTERS Does Not Cure Plaintiff's Failure to Present Evidence that the Voter List is a Section 8(i) Record.

Plaintiff appears to argue that because the MDVOTERS *in its entirety* is a Section 8(i) Record, then any "subset[s]" of data contained in MDVOTERS—including the data comprising the Voter List—are necessarily "records described by Section 8(i)" of the NVRA. Pl.'s Mem. 1; *see id.* at 15-18. Not so.

First, plaintiff's premise is incorrect: MDVOTERS is not, in its entirety, a Section 8(i) Record, because it contains numerous records that have nothing to do with the accuracy or currency of voter registration lists. These include items such as voting history, absentee ballot application history, petition-signing history, election worker modules, and candidacy modules that, for the vast majority of individuals with records in MDVOTERS, will have had nothing to do with list maintenance or voter lists. Wagner Decl. ¶ 12-13. In addition, many entries contain e-mail addresses and telephone numbers, neither of which are consulted or used in any list maintenance process. *Id.* ¶ 12. Thus, plaintiff cannot rely on the nature of MDVOTERS as a whole as a Section 8(i) Record for the proposition any subset of data retrievable *must also* be a Section 8(i) Record; it must affirmatively establish that the Voter List meets the criteria for inclusion as a Section 8(i) Record. As set forth above, this it has not done.

For this reason, plaintiff's authorities regarding whether "database searches, like the one Plaintiff seeks in requesting Montgomery County's voter list, create 'different'

documents" or "new record[s]," Pl.'s Mem. 17, 16, are inapposite.  The FOIA cases all make clear that while "[e]lectronic database searches are . . . not regarded as involving the creation of new records," the searches presuppose that the records sought "*are responsive to a request*."  *People for Am. Way Found. v. United States Dep't of Justice*, 451 F. Supp. 2d 6, 14 (D.D.C. 2006) (emphasis in the original); *accord Long v. Immigration & Customs Enforcement*, No. 17-cv-01097 (APM), 2018 WL 4680278, at *5 (D.D.C. Sept. 28, 2018). The same is true of plaintiff's cases interpreting the Federal Rules of Civil Procedure, *see Crocs, Inc. v. Effervescent, Inc.*, No. 06-cv-00605-PAB-KMT, 2017 WL 3888502, at *2 (D. Colo. Feb. 8, 2017) (issue was whether database search "was the creation of new evidence or discovery," not whether it was responsive), and the Federal Rules of Evidence, *see Branch v. Government Emp. Ins. Co.*, 286 F. Supp. 3d 771, 778 (E.D. Va. 2017) (referring to the admissibility of "responsive" database extracts under Fed. R. Evid. 803(6)).  Here, that is the very question at issue.

Second, even if MDVOTERS *was* a Section 8(i) Record in its entirety (though it is not), plaintiff's claim would still fail because generating a voter list from the data contained in MDVOTERS constitutes the creation of a *new* record, which the NVRA has never been interpreted to require.  Section 8(i) provides that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection" certain "records."  52 U.S.C. § 20507(i)(1).  But under the "analogous" provisions of the federal Freedom of Information Act (*see* Pl.'s Mem. 26), while an agency may be required to "to search for the [responsive] records in electronic form or format," it is not required to produce "a listing or index of a database's contents that does not seek the contents of the database, but instead essentially

24

seeks information about those contents, . . . insofar as the agency has not previously created and retained such a listing or index." *National Sec. Counselors v. C.I.A.*, 898 F. Supp. 2d 233, 271 (D.D.C. 2012). Plaintiff's request for the Voter List does just that. MDVOTERS is a comprehensive database for which each entry or record contains dozens of coded fields, inputted data, numerous scanned records reflecting pertinent voter registration transactions for the individual in question, and an activity log documenting historical changes to the record. Plaintiff has not asked for the contents of these records based on a particular search; instead, plaintiff seeks, literally, a particular "listing or index" that the State Board "has not previously created and retained" that provides "information about th[e] contents" of the database. The NVRA—like the FOIA—does not require States to create new records in response to public inspection requests.

### 3.     Voter Lists are Not Section 8(i) Records as a Matter of Law.

Apart from plaintiff's failure to prove that the Voter List is a Section 8(i) Record as a matter of undisputed fact, plaintiff has also failed to establish that the Voter List is a Section 8(i) Record as a matter of law. As we argued in defendants' motion to dismiss, the plain language of the NVRA "does not require the disclosure of voter lists themselves, but only records related to *the implementation of programs and activities* designed to ensure the accuracy of those lists." Mem. of L. in Support of State Defs' Mot. to Dismiss Pl.'s Compl. or, in the Alternative, for Summ. J. 9 (Dkt. No. 9) (the "Mot. to Dismiss"). A voter list, by contrast, "does not disclose any substantive information about Maryland's list-maintenance program, or why a particular voter is on the list and why another is not," nor does it "show how the agency reviewed an application to register or how it handled

25

situations where a registered voter moves out of the jurisdiction, denies his or her citizenship for purposes of jury duty, or simply asks to be removed from the list." *Id.* at 13; *see also id.* at 14 ("it is simply a list of names").

The statute itself recognizes this distinction.  In describing the records that a State must "maintain for at least 2 years and . . . make available for public inspection," section 20507(i) refers to records concerning the implementation of programs and activities conducted to ensure the accuracy of voter lists, but then *declines* to specify that the voter lists themselves—despite being specifically identified in the provision—should be included in that category.  *See* 52 U.S.C. § 20507(i)(1); *compare id.* § 20507(i)(2) (specifying that Section 8(i) Records include "the names and addresses of all persons to whom" confirmation notices "are sent, and information concerning whether or not each such person has responded to the notice").  Plaintiff's proposed interpretation gives rise to the circular and, on its face, nonsensical construction that the *voter list* is a record concerning the implementation of a program and activity undertaken to ensure the accuracy of the *voter list*.  "[N]othing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion."  *United States v. Davis*, 53 F.3d 638, 642 (4th Cir. 1995).  If Congress had truly intended the nonsensical facial interpretation advanced by Plaintiff, it would have said so.

Also pertinent in the statutory analysis is the impracticality—indeed, the absurdity—of an interpretation of Section 8(i) that would require the State to maintain *two years'* worth of registered voter lists, when these lists are in near-constant flux.

26

"[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration . . . of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989) (quoting *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892)).   Interpreting the record retention and public inspection provisions of Section 8(i) to require the State to preserve and make available for inspection *thousands* of different "versions" of its list is exactly the sort of "absurd result[]" that Congress could not have intended, and that this Court should not now impose.

      **B.**      **Plaintiff Has Failed to Carry its Burden of Showing that Maryland's Modest Limitations on Access to the Voter List are Preempted by the NVRA.**

Plaintiff also fails the second prong of its challenge to Maryland's denial of its request for the Voter List—its claim that Elec. Law § 3-506 is preempted by the public inspection provisions of the NVRA.   There are three ways in which federal law may preempt state law: express preemption, "field" preemption, and conflict preemption. *See Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).   Plaintiff advances only the latter two theories of preemption in its motion. *See* Pl.'s Mem. 20.   Neither has merit.

"Field" preemption exists where the federal law at issue is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Gade*, 505 U.S. at 98.   It is plain that the regulation of elections—even of voter registration, more narrowly—is not a "field" that has been occupied by the federal government to the

27

exclusion of the states.  It says so right in the Constitution.  The "Elections Clause" provides that "The Times, Places and Manner of holding Elections for Senators and Representatives, *shall be prescribed in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added).  The Supreme Court has held that this clause softens the presumption against pre-emption that applies in instances where Congress "legislate[s] in areas traditionally regulated by the States," because federal legislation pursuant to the Elections Clause "*necessarily* displaces some element of a pre-existing legal regime erected by the States."  *Arizona v. Inter-Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13, 14 (2013).  But at the same time, the Court acknowledged that federal law displaces only "some element of a pre-existing legal regime erected by the States," not the legal regime as a whole.  Indeed, the Court went so far as to characterize elections regulation as "an area of concurrent state and federal power," *id.* at 14 n.6, hardly an endorsement that the federal government has occupied the field of elections regulation.[10]

"Conflict" preemption can occur in two ways: where "compliance with both federal and state regulations is a physical impossibility," and when state law "stands as an obstacle

---

[10] Plaintiff attaches significance to the Supreme Court's characterization of the NVRA as "a complex superstructure of federal regulation atop state voter-registration systems," Pl.'s Mem. 20 (quoting *Inter Tribal*, 133 S. Ct. at 2251), but this characterization supports defendants, not plaintiff.  The NVRA's regulatory structure sits "atop state voter-registration systems"; it does not "*supplant* state authority throughout [the] particular field."  *Lagrimas v. Gossel*, No. CIV. A. HAR 92-2262, 1993 WL 18951, at *1 (D. Md. Jan. 25, 1993) (emphasis added).

to the accomplishment and execution of the full purposes and objectives of Congress." *Gade*, 505 U.S. at 98 (internal quotation marks omitted). Plaintiff contends "it is literally impossible for Judicial Watch, a D.C. non-profit, ever to meet Maryland's requirement [for obtaining a voter list] that it be a 'Maryland registered voter,'" and that therefore Elec. Law § 3-506 conflicts with—and is preempted by—Section 8(i) of the NVRA. Pl.'s Mem. 20. But "impossibility preemption" is "demanding." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). "The party urging preemption must do more than show that state law precludes its use of the most cost-effective and practical means of complying with federal law—it must show that federal and state laws directly conflict." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 99 (2d Cir. 2013) (internal quotation marks and citation omitted).

The NVRA requires states to make Section 8(i) Records "available for public inspection." 52 U.S.C. § 20507(i)(1). Even assuming the Voter List were such a record,[11] Maryland fulfills this requirement by making its voter lists available for public inspection to over 4 million Maryland registered voters.[12] While it may not be "cost-effective" or

---

[11] As discussed above, plaintiff has failed to carry its burden of showing that the Voter List is a Section 8(i) Record. *See supra* § II.A. As discussed below, the Voter List is not. *See infra* § III.B.

[12] Maryland law also requires applicants to swear an oath that the requested list will not be used for commercial solicitation or "any other purpose not related to the electoral process," requires applicants to submit a "written application" for any list, and authorizes the State Administrator to adopt regulations that specify "the fee to be paid for providing a list." *See* Elec. Law §§ 3-506(a)(1)(i) – (ii), 3-506(a)(2). Plaintiff has alleged that all of these provisions are preempted by the NVRA, *see* Compl. ¶ 32, but has moved for summary judgment only as to the requirement that an applicant be a Maryland registered voter. *See*

"practical" from plaintiff's perspective to have to comply with the limitations on access imposed by Maryland law, there is no "direct[] conflict" between state and federal law, because nothing in the NVRA precludes Maryland from imposing reasonable limitations around the public inspection that it provides.  "Congress enacted the NVRA in order to 'increase the number of eligible citizens who register to vote' in federal elections, 'enhance[] the participation of eligible citizens as voters,' 'protect the integrity of the electoral process,' and 'ensure that accurate and current voter registration rolls are maintained.'" *Long*, 682 F. 3d at 334.  Maryland voters bear the greatest risk that Maryland registered voter lists will be misused for commercial gain, and are also the persons who are most directly impacted by the accuracy and integrity of such lists.  This Court has already held that "the residency restriction in E.L. § 3-506(a)(1)(i) is a reasonable threshold limitation on access to State records" that "does not violate the Constitution."  *Fusaro v. Davitt*, 327 F. Supp. 3d 907, 924 (D. Md. 2018).  The same result should obtain under the NVRA.

---

Pl.'s Mem. 18-20 (arguing only that the "registered Maryland voters" requirement of Elec. Law § 3-506 is preempted by the NVRA).

III.   **DEFENDANTS' CROSS-MOTION SHOULD BE GRANTED BECAUSE THE UNDISPUTED FACTS SHOW THAT PLAINTIFF IS NOT ENTITLED TO THE VOTER LIST UNDER STATE OR FEDERAL LAW.**

A.   **Plaintiff Does Not Qualify to Obtain the Voter List Under the Provisions of State Law.**

There is no dispute that plaintiff does not meet the qualifications for obtaining the Voter List under State law.  *See* Elec. Law § 3-506(a).  Plaintiff concedes that it is not and can never become a Maryland registered voter.  *See* Compl. ¶¶ 5, 24.[13]

B.   **The Voter List is Not Covered by Section 8(i) of the NVRA as a Matter of Fact or Law.**

The Voter List is not a Section 8(i) Record as matter of fact and as a matter of law. The undisputed facts show that generating a list of registered voters from the records contained in MDVOTERS constitutes the creation of a new record, which Section 8(i) of the NVRA does not obligate states to do.  *See* Smith Decl. ¶ 7.  The undisputed facts also show that election officials do not consult, review, or utilize the Voter List when updating the records for Montgomery County registrants in the MDVOTERS database.  *See* Wagner Decl. ¶ 18.  They do not isolate only the records of registered Montgomery County voters before making such updates.  *Id.*  They do not maintain the Voter List itself in connection with such activities.  *Id.*  And they do not do any of these things when conducting audits of voter registration transactions for Montgomery County entered in MDVOTERS.  Smith

---

[13] Plaintiff has also failed to submit its request for the Voter List on a "written application" and has failed to submit a "statement, signed under oath, that the list is not intended to be used for" "commercial solicitation" or "any other purpose not related to the electoral process."  Elec. Law § 3-506(a)(ii).

Decl. ¶ 5.  This evidence is not only sufficient to deny plaintiff's motion for summary judgment, it is sufficient to grant that of the defendants.

But even if it were not, the Voter List is not a Section 8(i) Record purely as a matter of law.  As set forth above, interpreting Section 8(i)'s records retention and public inspection obligations to extend to voter lists gives rise to a circular, nonsensical reading of the statute and produces absurd results.  *See supra* II.A.iii.  This legal conclusion, too, is grounds not only for denial of plaintiff's motion, but also for granting that of the defendants.

**C.**     **Even if the Voter List Were Covered by Section 8(i), Maryland's Limitations on Access to that List Are Not in Conflict with Federal Law.**

For the reasons expressed above, the limitation that only "Maryland registered voters" are entitled to inspect a list of registered voters under Maryland law is not preempted by the NVRA.  *See supra* § II.B.  The federal government has not occupied the "field" of election regulation broadly or even of voter registration more narrowly, and there is no conflict between with the NVRA's public inspection requirement and Maryland's registered voter condition, because voter registration lists in Maryland are available for "public inspection" to Maryland registered voters.  *See id*.  Defendants are entitled to summary judgment on this claim.

Defendants are also entitled to summary judgment on plaintiff's claim that Section 8(i) preempts the other prerequisites for obtaining a voter list imposed by § 3-506.

Plaintiff asserts that Maryland's requirement of a "written application" for obtaining voter lists conflicts with Section 8(i).  Compl. ¶ 32(a); *see* Elec. Law § 3-506(a)(i).  It is

32

difficult to see how.  For example, FOIA, which imposes similar "public inspection" requirements with regard to federal agency records, *see* 5 U.S.C. § 552(a)(2), requires that requests for access to materials be made "in writing."  *See FOIA.gov FAQ page*, *available at*: ***https://www.foia.gov/faq.html*** (last visited March 11, 2019) ("The request simply must be in writing and reasonably describe the records you seek.")  That a "written application" is required does not conflict with the requirement that Section 8(i) Records be made available for "public inspection."

Next, plaintiff claims that the "statement under oath about the intended use of the voter list" required by Maryland law is in conflict with the requirements of Section 8(i). Compl. ¶ 32(b); *see* Elec. Law § 3-506(a)(ii).  This, too, is mistaken.  The *purpose* of the NVRA was to increase voter registration and participation, "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained."  *Long*, 682 F. 3d at 334 (quoting 52 U.S.C. 20501).  Maryland's requirement that an applicant for voter registration swear that the list is not intended to be used for "any purpose not related to the electoral process" is entirely consistent with the NVRA's text and objectives.  There is no conflict.

Plaintiff also challenges the statute's authorization of the State Board "to regulate the authorization required for providing a voter list" on preemption grounds.  Compl. ¶ 32(c); *see* Elec. Law § 3-506(a)(2)(ii).  But plaintiff has failed to identify an actual regulation, promulgated pursuant to this statutory authority, that runs contrary to the requirements of the NVRA.  That the State Board *may* impose regulations that are

inconsistent with the requirements of the NVRA does not give rise to a case or controversy under Article III.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992).

Plaintiff next challenges the statute's authorization of the State Board to establish "a fee for *providing* a list," on the ground that the NVRA only permits "a *reasonable* fee for *copying* a list."  Compl. ¶ 32(d); *see*  Elec. Law § 3-506(a)(2)(iii).  This is splitting hairs.  The State Board charges $125 for a statewide voter list that, if printed, would comprise over 120,000 pages.  However that fee is characterized, its "reasonableness" is underscored by the fact that it is well within this Court's schedule of fees for the cost of electronic copies of documents. *See U.S. District Court for the District of Maryland Schedule of Fees* ($.10/page copy charges for electronic copies of documents).  Moreover, the State Board allows for waivers of the fee where an applicant can demonstrate need or the "public interest" otherwise supports such waiver.  *See* COMAR 33.03.02.06A, 33.03.02.06C.  The State's modest fee for voter lists is not preempted.

Finally, plaintiff contends that the statute's authorization of the State Board "to specify the information to be provided with a voter list" is preempted by the NVRA. Compl. ¶ 32(e).  But, except for the voter's date of birth, all of the information requested by plaintiff is available via request for a voter list under Elec. Law § 3-506.  *See* Compl. ¶ 16 (requesting "name, date of birth, home address, most recent voter activity, and active or inactive status"); *compare* Application at 2 (listing fields to be included in "registered voter list").  And even plaintiff's authorities acknowledge that dates of birth may properly be redacted from records made available for public inspection because, "when combined with other identifying information . . . [they] can be used to obtain . . . a host of other highly

personal information about an individual." *True the Vote*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014).  Indeed, the knowledge that "birthdays, along with . . . names, addresses, and potentially other identifying information could be disclosed to any requester" may cause voters to decline to register.  *See id.*  The State Board has made the determination that publishing voters' dates of birth on a voter registration list could violate voters' privacy and depress voter registration.  *See* Wagner Decl. ¶ 19.  The absence of dates of birth on the Voter List does not draw Maryland's policy into conflict with the NVRA.  *See True the Vote*, 43 F. Supp. 3d at 740.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for summary judgment should be denied, and defendant's cross-motion for summary judgment should be granted.

BRIAN E. FROSH
Attorney General of Maryland

/s/ Andrea W. Trento
_____
Robert A. Scott (Fed. Bar # 24613)
Andrea W. Trento (Fed. Bar # 28816)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
rscott@oag.state.md.us
atrento@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile

Attorneys for the State Defendants