IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUDICIAL WATCH, INC.
    *Plaintiff*,

    v.

LINDA LAMONE, *et al.*
    *Defendants*.

Civil Action No. ELH-17-2006

## MEMORANDUM OPINION

This litigation concerns an organization's request under state and federal law for access to the voter registration list for Montgomery County, Maryland.

Plaintiff Judicial Watch, Inc. ("Judicial Watch") has sued a host of defendants, in their official capacities, including Linda Lamone, the Maryland Administrator of Elections, to compel compliance with Section 8(i)(1) of the National Voter Registration Act of 1993 ("NVRA" or the "Act"), codified, as amended, at 52 U.S.C. § 20507(i)(1). *See* ECF 1 ("Complaint"). The remaining defendants include David McManus, Jr., the Chairman of the Maryland State Board of Elections ("SBE"); Patrick Hogan, the Vice-Chairman of the SBE; Jared DeMarinis, the Public Information Act Officer and Director of the Division of Candidacy and Campaign Finance for SBE; and SBE Members Michael Cogan, Kelley Howells, and Gloria Lawlah (collectively, the "State Defendants"). *Id.*[1]

In addition, plaintiff sued James Shalleck, the President of the Montgomery County Board

---

[1] It appears that Lawlah is no longer an SBE Member. *See* MARYLAND.GOV, STATE BOARD OF ELECTIONS, http://elections.maryland.gov/about/index.html (last visited Aug. 5, 2019). Lawlah was an SBE Member from 2016 through an unspecified date in 2018. *See* MARYLAND MANUAL ON-LINE, SECRETARIES, DEPARTMENT OF AGING, GLORIA GARY LAWLAH, http://msa. maryland.gov/msa/mdmanual/10da/former/html/msa12153.html (last visited Aug. 5, 2019).

of Elections ("MCBE"); Nahid Khozeimeh, the Vice-President of the MCBE; Mary Ann Keeffe, the Secretary of the MCBE; Alexander Vincent and David Naimon, MCBE Members; and Jacqueline Phillips, an MCBE Substitute Member (collectively, the "County Defendants"). *Id.* However, on June 4, 2018, the Court granted the County Defendants' motion to dismiss (ECF 2), thereby dismissing them from the case. ECF 34; ECF 35.

Following discovery, plaintiff moved for summary judgment (ECF 43), supported by a memorandum of law (ECF 43-1) (collectively, the "Motion") and exhibits. ECF 43-2 to ECF 43-6. The defendants filed a cross motion for summary judgment (ECF 49), supported by a memorandum of law (ECF 49-1) (collectively, the "Cross Motion") and exhibits. ECF 49-3 to ECF 49-10. Plaintiff filed an opposition to the Cross Motion, along with four additional exhibits. *See* ECF 52-1 through ECF 52-4. Defendants replied (ECF 53) and submitted an additional exhibit. *See* ECF 53-1.

No hearing is necessary to resolve the motions. *See* Local Rules 105.6. For the reasons that follow, I shall GRANT the Motion (ECF 43) in part and DENY it in part, and I shall DENY the Cross-Motion (ECF 49).

## I.    Factual Background

### A.

Judicial Watch describes itself as a "not-for-profit, educational organization" that is dedicated to "promot[ing] transparency, integrity, and accountability in government." ECF 1, ¶ 5. According to Judicial Watch, it "regularly requests records from state and local governments pursuant to Section 8(i) of the NVRA, and state open-records laws . . . ." *Id.* And, it "analyzes all responses and disseminates both its findings and the requested records to the American public to inform it about 'what the government is up to.'" *Id.* (citation omitted).

On April 11, 2017, Thomas Fitton, President of Judicial Watch, sent an email to Lamone, as well as the officers and members of both the SBE and the MCBE. ECF 1, ¶ 11. The email included a letter to McManus dated April 11, 2017. *See* ECF 1-1 ("Notice Letter"). Hogan, Cogan, Howells, Lawlah, Lamone, Shalleck, Khozeimeh, Keefe, Vincent, Naimon, Popper, and Nikki Charlson, the Deputy State Administrator of the SBE, were copied on the Notice Letter. ECF 1-1 at 7.[2] The Notice Letter, which is appended to the suit (ECF 1-1), was also sent by certified mail to the SBE and the MCBE. ECF 1, ¶ 11.

The Notice Letter stated, in part, ECF 1-1 at 1-7 (emphasis added):

Dear Chairman McManus:

We write to bring your attention to violations of Section 8 of the National Voter Registration Act ("NVRA") in Montgomery County, Maryland. From public records obtained, Montgomery County has more total registered voters than adult citizens over the age of 18 as calculated by the U.S. Census Bureau's 2011-2015 American Community Survey. This is strong circumstantial evidence that Montgomery County is not conducting reasonable voter registration record maintenance as mandated under the NVRA.

         \*     \*     \*

This letter serves as statutory notice that Judicial Watch will bring a lawsuit against your office if you do not take specific actions to correct these violations of Section 8 within 90 days. In addition, by this letter we are asking you to produce certain records to us which you are required to make available under Section 8(i) of the NVRA.

         \*     \*     \*

You are receiving this letter because you are the designated chief state election official under the NVRA.

         \*     \*     \*

In order to avoid litigation, we hope you will promptly initiate efforts to comply with Section 8 so that no lawsuit will be necessary. We ask you to please

---

[2] Phillips was not copied on the Notice Letter.

respond to this letter in writing no later than 45 days from today informing us of the compliance steps you are taking. Specifically, we ask you to: (1) conduct or implement a systematic, uniform, nondiscriminatory program to remove from the list of eligible voters the names of persons who have become ineligible to vote by reason of a change in residence; and (2) conduct or implement additional routine measures to remove from the list of eligible voters the names of persons who have become ineligible to vote by reason of death, change in residence, or a disqualifying criminal conviction, and [(3)]to remove noncitizens who have registered to vote unlawfully.

*     *     *

[P]ursuant to your obligations under the NVRA, please make available to us all pertinent records concerning "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency" of Maryland's official eligible voter lists during the past 2 years. Please include these records with your response to this letter. These records should include, but are not limited to:

1. *Copies of the most recent voter registration database from Montgomery County, Maryland, including fields indicating name, date of birth, home address, most recent voter activity, and active or inactive status.*

2. Copies of all email or other communications internal to the office of the Maryland State Board of Elections, including any of its divisions, bureaus, offices, third party agents, or contractors, (hereinafter, collectively "State Board of Elections") relating to the maintenance of accurate and current voter rolls.

3. Copies of all email or other communications between the State Board of Elections and all Maryland County Voter Registration Officials concerning:

    a. Instructions to the counties concerning their general list maintenance practices and obligations;
    b. Instructions to the counties for the removal of specific noncitizens and deceased, relocated, or convicted persons identified by the State Board of Elections; and
    c. Notices to the counties concerning any failure to comply with their voter list maintenance obligations under Maryland's program.

4. Copies of all email or other communications between the Maryland State Board of Elections and the Maryland State Department of Health, the Maryland State Department of Corrections, the Maryland Motor Vehicle

Administration, and the Maryland State Judiciary concerning obtaining information about deceased, relocated, convicted, or noncitizen registered voters for the purpose of updating Maryland's voter registration lists.

5. Copies of all email or other communications between the State Board of Elections and the U.S. Attorney(s) for Maryland, the U.S. District Court for Maryland, the U.S. Social Security Administration, the U.S. Postal Service, the U.S. Citizenship and Immigration Services, and the U.S. Department of Homeland Security concerning the National Change of Address database, the Systematic Alien Verification for Entitlements database, or any other means of obtaining information about deceased, relocated, convicted, or noncitizen registered voters for the purpose of updating Maryland's voter registration lists.

6. Copies of all email or other communications between the State Board of Elections and the Interstate Voter Registration Cross-Check Program, the Electronic Registration Information Center, the National Association for Public Health Statistics and Information Systems, and any other U.S. State concerning obtaining information about deceased or relocated registered voters for the purpose of updating Maryland's voter registration lists. . . .

The SBE's Nikki Charlson sent an email to Judicial Watch on May 26, 2017, indicating that the SBE had received the Notice Letter. ECF 1, ¶ 18. Further, she stated that the SBE would issue a response to Judicial Watch, and that the SBE would provide Judicial Watch with the "requested documents next week." *Id.*[3]

Judicial Watch received a letter from Lamone on June 5, 2017. *Id.* ¶ 19; ECF 19-2.[4] Lamone stated, *inter alia*, that Maryland's voter list maintenance program complies with the NVRA, that the SBE was compiling "responsive" documents, and that the SBE would provide those documents to Judicial Watch "'shortly.'" ECF 1, ¶¶ 19-20; ECF 19-2.

By email dated July 7, 2017 (ECF 1-2), DeMarinis informed plaintiff, *id.*: "The documents that you requested from your April 11, 2017 letter are ready for review. However, . . . the request

---

[3] A copy of the email was not submitted.

[4] The letter (ECF 19-2) was sent by certified mail and by email.

for the Montgomery County voter registration list was not made in accordance with Election Law Article 3-506. Therefore, it will not be processed." ECF 1, ¶¶ 21-22; *see* Md. Code (2017 Repl., 2018 Supp.), § 3-506(a) of the Election Law Article ("E.L.") (stating that upon request "a list of registered voters shall be provided to a *Maryland registered voter*") (emphasis added).

On July 11, 2017, Popper, as counsel for plaintiff, spoke by telephone with DeMarinis. ECF 1, ¶ 24. During that call, Popper noted that Judicial Watch is organized under D.C. law and therefore it could not be "a Maryland registered voter," as required by E.L. § 3-506(a)(1). ECF 1, ¶ 24. As a result, plaintiff could not obtain the "requested voter list." *Id.* DeMarinis confirmed that the Maryland Attorney General's office had so indicated. *Id.*

As indicated, in Judicial Watch's Notice Letter, plaintiff requested "[c]opies of the most recent voter registration database." ECF 1-1 at 5. Plaintiff has since clarified that it is seeking the most recent voter registration "list" for Montgomery County, rather than the database. ECF 52 at 6 ("In light of what Plaintiff learned in discovery, it probably would have been more accurate in the April 2017 notice letter to request the most recent voter registration 'list' rather than 'database.'"). As defendants put it, "the record is now clear that the subject matter of this case has only ever been the Voter List (and not a Montgomery County database)[.]" ECF 49-1 at 26.

**B.**

Maryland maintains and manages its voter registrations through MDVOTERS (the "Database"), a statewide database containing voter registration records for Maryland elections. *See* ECF 43-3 (Deposition of Mary Cramer Wagner) at 6, p. 26:17-21; ECF 43-4 (Deposition of Janet Smith) at 13, p. 71:11-21. Each voter registration is represented in MDVOTERS by a separate entry, and each entry is composed of three parts: voter data, images of transaction source documents, and an activity log.

The voter data consists of the voter's personal information, as well as information on the voter's registration status. The information about the voter is organized into data fields or categories, each containing one piece of information. The fields in MDVOTERS include name, date of birth, and address. *See* ECF 43-4 at 13, p. 71:11-14; ECF 49-8 (Decl. of Mary Cramer Wagner), ¶¶ 16-17. Each entry also includes fields for "the individual's current registration status, the reason for the most recent change in status, and the source of the change[.]" ECF 49-8, ¶ 7. Because each voter registration contains many of the same fields, an official can use the fields to search, sort, filter, or otherwise access the data concerning the voters. Therefore, an official could produce a list of Maryland voters in Montgomery County. *See* ECF 49-1 at 38.

Mary Cramer Wagner, the SBE's Director of the Voter Registration and Petition Division, explained in her Declaration that each registration contains images of transaction source documents, "scanned documents reflecting all voter registration transactions and certain other transactions in the individual's history." ECF 49-8, ¶ 7. She stated, *id.* ¶ 8: "When a person's record is updated as a result of a voter registration or other transaction, any document evidencing that transaction (e.g., voter registration application), is scanned into the database and associated with that record." These documents are used to verify the personal information used to populate or update the voter data in the voter registration entry. *See id.* ¶¶ 16-17.

A separate activity log is maintained for each voter. The activity log tracks changes to the voter's data, such as changes in voter registration. ECF 43-4 at 13, pp. 70:13-71:3.

Although the State Board of Elections maintains MDVOTERS, local boards of elections process most voter registration transactions on a record-by-record basis within the Database. *See* ECF 43-3 at 5, pp. 16:20-17:13; *id.* at 12-13, pp. 73:14-74:2. To assist the local boards, the SBE provides training regarding proper list maintenance procedures, circulates biweekly newsletters

containing registration-related information and updates, and publishes guidance documents directing election officials on how to process records that present certain scenarios. *See* ECF 49-6 (Deposition of Janet Smith), at 10:11-12:5; ECF 49-8, ¶ 15.

Local boards of election also conduct audits of other local boards' voter registration transactions. ECF 49-9 (Decl. of Janet Smith), ¶ 6. To audit voter registration transactions, a local election official pulls a subset of individual voter registrations from the Database through a search query. ECF 49-6 at 29:17-33:11. The local election official then checks each transaction against the scanned source document to ensure that it was processed properly. *See* ECF 49-9, ¶ 4. State officials, such as Maryland's Voter Registration Manager of Audits, Janet Smith, also conduct audits of voter registration transactions. *See* ECF 43-4 at 28:17-31:13; ECF 49-9, ¶ 3.

## II. Standard of Review

Both parties have moved for summary judgment under Fed. R. Civ. P. 56. Rule 56(a) provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in *Bouchat*) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208,

216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations.  *Wilson v. Prince George's Cty.*, 893 F.3d 213 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).  Merely because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  "Both motions must be denied if the court finds that there is a genuine issue of material fact.  But, if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed.).

### III.    Discussion

Judicial Watch maintains that under Section 8(i) of the NVRA, it is entitled to production of the voter registration list for Montgomery County.  Judicial Watch also asserts that the NVRA preempts any Maryland state election laws that prevent it from obtaining the records.

Defendants counter that a voter list is not a "record" under Section 8(i).  In their view, a voter list is not used in the "'implementation of programs or activities'" that ensure the accuracy

and currency of MDVOTERS. ECF 49-1 at 20 (quoting 52 U.S.C. § 20507(i)(1)). They also assert that Maryland state election law is not preempted by the NVRA and may limit the production of voting-related records more strictly than the NVRA.

I begin with a review of the relevant statutes.

## A.

"The NVRA reflects the view of Congress that the right to vote 'is a fundamental right,' that government has a duty to 'promote the exercise of that right,' and that discriminatory and unfair registration laws can have a 'damaging effect on voter participation' and 'disproportionately harm voter participation by various groups, including racial minorities.'" *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (quoting 42 U.S.C. § 1973gg(a), *as amended*, 52 U.S.C. § 20501(a)); *see also Harkless v. Brunner*, 545 F.3d 445, 449 (6th Cir. 2008); *Voter Integrity Protect of N.C., Inc. v. Wake Cty. Bd. of Elec.'s*, 301 F. Supp. 3d 612, 614-15 (E.D.N.C. 2017); *Action N.C. v. Strach*, 216 F. Supp. 3d 597, 609 (M.D.N.C. 2016); *N.C. State Conference of the NAACP v. N.C. State Bd. of Elec.'s*, 16-cv-1274, 2016 WL 6581284, at *2-3 (M.D.N.C. Nov. 4, 2016).

To that end, the NVRA is intended to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance[] the participation of eligible citizens as voters in elections for Federal office," § 20501(b)(2); "to protect the integrity of the electoral process," § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." § 20501(b)(4); *see Long*, 682 F.3d at 334; *Action N.C.*, 216 F. Supp. 3d at 609; *N.C. State Conference of the NAACP*, 2016 WL 6581284, at * 2-3; *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 719 (S.D. Miss. 2014). But, "[t]he NVRA was not designed as a tool to root out voter fraud, 'cross-over voting,' or any other illegal

11

or allegedly illegal activity associated with casting a ballot on election day." *True the Vote*, 43 F. Supp. 3d at 722 (citation omitted).

Under the NVRA, states must provide at least three methods for eligible voters to register to vote in federal elections: "by application made simultaneously with an application for a motor vehicle driver's license," 52 U.S.C. § 20503(a)(1);[5] "by mail application," using a federally prescribed form, *id.* § 20503(a)(2); and "by application in person" at a designated voter registration agency. *See id.* § 20503(a)(3); *see also Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 5 (2013); *Long*, 682 F.3d at 334; *Action N.C.*, 216 F. Supp. 3d at 609; *True the Vote*, 43 F. Supp. 3d at 719.

Pursuant to 52 U.S.C. § 20507(a)(4), the NVRA also requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of — (A) the death of the registrant; or (B) a change in the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4)(A)-(B). Otherwise, under Section 20507(a)(3)(A)-(B), "the name of a registrant may not be removed from the official list of eligible voters except — (A) at the request of the registrant;" or "(B) as provided by State law, by reason of criminal conviction or mental incapacity." *See also Long*, 682 F.3d at 334; *N.C. State Conference of the NAACP*, 2016 WL 6581284, at * 3. A state may meet the requirements of 52 U.S.C. § 20507(a)(4) by establishing a program under Section 20507(c)(1). *See A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 707 (6th Cir. 2016) ("[W]e note that in subsection (c)(1) of Section 8, Congress provided states with an example of a procedure for identifying and removing voters . . . that would comply with the NVRA's mandates and accompanying

---

[5] For this reason, the provision is commonly known as the "Motor Voter Act." ECF 43-1 at 5.

constraints."); *Bellitto v. Snipes*, 221 F. Supp. 3d 1354. 1364-65 (S.D. Fla. 2016) ("[T]he Court finds . . . that full compliance with subsection (c)(1) 'would comply with the NVRA's mandates and accompanying constraints.'") (citation omitted).

Section 20507(c)(1) of 52 U.S.C. states:

(c) Voter removal programs

(1) A State may meet the requirement of subsection (a)(4) by establishing a program under which—

(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

(B) if it appears from information provided by the Postal Service that—

(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

"Notice" is defined in 52 U.S.C. § 20507(d)(2)(A) as "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state," *inter alia*, "his or her current address[.]" And, "[i]f the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote." *Id.* § 20507(d)(2)(B).

The NVRA provides for a private right of action. 52 U.S.C. § 20510(b). However, before an injured party may file suit, it must "provide written notice of the violation to the chief election official of the State involved." *Id.* § 20510(b)(1). And, the injured party may file suit only if "the violation is not corrected within 90 days after receipt of a notice" or "within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office[.]" *Id.* § 20510(b)(2). But, notice need not be provided if the violation occurred "within 30 days before the date of an election for Federal office." *Id.* § 20510(b)(3).

As indicated, plaintiff's Notice Letter requested documents pursuant to Section 8(i)(1) of the NVRA. *See* ECF 1-1; *see also* ECF 1, ¶¶ 15-16. Of import here, NVRA § 8(i)(1) requires states to make certain records available to the public for inspection. *See* 52 U.S.C. § 20507(i)(1); *see also Long*, 682 F.3d at 334-35; *Voter Integrity Protect of N.C., Inc.*, 301 F. Supp. 3d at 615. Section 8(i) states, 52 U.S.C. § 20507(i) (emphasis added):

(i) Public disclosure of voter registration activities

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

**B.**

In Judicial Watch's Notice Letter, it requested, *inter alia*, "[c]opies of the most recent voter registration *database* from Montgomery County, Maryland." ECF 1-1 at 5 (emphasis

added); *see also* ECF 1, ¶¶ 16, 27-28. However, as noted, Judicial Watch has clarified that it seeks the most recent voter registration "list."

The parties dispute whether a voter registration list is a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). As with any question of statutory interpretation, the analysis begins "with the text of the statute." *United States v. Serafini*, 826 F.3d 146, 149 (4th Cir. 2016); *see Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *Permanent Mission of India to the U.N. v. City of N.Y.*, 551 U.S. 193, 197 (2007); *In re Wright*, 826 F.3d 774, 779 (4th Cir. 2016).

The Court "must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute . . . ." *United States v. Bly*, 510 F.3d 453, 460 (4th Cir. 2007). If the statutory language is unambiguous, "'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Clark v. Absolute Collection Serv., Inc.*, 741 F.3d 487, 490 (4th Cir. 2014) (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)).

"[W]hen deciding whether the language is plain [the court] must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. ___, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)) (internal quotation marks omitted). Courts "'construe statutes, not isolated provisions.'" *Burwell*, 135 S. Ct. at 2489 (quoting *Brown & Williamson*, 529 U.S. at 132). Indeed, the "'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" *Burwell*, 135 S. Ct. at 2489 (quoting *Brown & Williamson*, 529 U.S. at 132).

Section 8(i)(1) of the NVRA states, in relevant part, 52 U.S.C. § 50207(i)(1):

> Each State shall maintain for at least 2 years and make available for public inspection and, where available, photocopying at a reasonable cost, *all records* concerning the implementation of *programs and activities* conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(Emphases added).

The Fourth Circuit has clarified the meaning of Section 8(i)'s key terms. In *Long*, 682 F.3d at 333, a non-profit organization requested that Virginia produce completed voter registration applications, but Virginia refused. At summary judgment, the district court concluded that the plaintiff was entitled to the applications, pursuant to Section 8(i) of the NVRA. The Fourth Circuit affirmed, concluding that voter applications were encompassed within the "plain and ordinary meaning" of Section 8(i)(1). *Id.* at 333.

The Court's decision was primarily predicated on four determinations. First, the Court determined that "the process of reviewing voter registration applications is a '*program*' . . . because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an '*activity*' because it is a particular task . . . of Virginia election employees." *Id.* at 335 (emphases added; citation omitted).

Second, the Court determined that "the 'program' and 'activity' of evaluating voter registration applications is plainly 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" *Id.* at 335 (quoting 42 U.S.C. § 1973gg-6(i)(1), *as amended*, 52 U.S.C. § 20507(i)(1)). On this point, the Court reasoned that "the process of reviewing voter registration applications keeps official voter lists both 'accurate'—*free from error*—and 'current'—*most recent*." *Long*, 682 F.3d at 335 (emphases added). By registering eligible applicants and rejecting ineligible applicants, state officials "ensure that the state is

keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." *Id.*

Third, the Court stated that "the registration applications requested by Project Vote are clearly 'records concerning the implementation of' this 'program[] and activit[y].'" *Id.* at 335-36 (quoting 42 U.S.C. § 1973gg-6(i)(1), *as amended*, 52 U.S.C. § 20507(i)(1)) (alterations in original). This is because the applications are "'the means by which an individual provides the information necessary for [Virginia] to determine his eligibility to vote.'" *Id.* at 336 (citation omitted).

Finally, in the Court's view, Section 8(i)(1) "'very clearly requires that *all* records be disclosed.'" *Id.* at 336 (emphasis in original; citation omitted); *see* 52 U.S.C. § 20507(i)(1). In this regard, the Court observed that "'the use of the word all [as a modifier] suggests an expansive meaning because all is a term of great breadth.'" *Id.* (quotation marks omitted) (alteration in original) (quoting *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen,* 152 F.3d 283, 290 (4th Cir. 1998)). Moreover, the Court was of the view that the phrase "shall include," as used in Section 8(i)(2) of the NVRA, "sets 'a floor, not a ceiling'" as to the sorts of "records" that must be disclosed under Section 8(i)(1). *Id.* at 336-37 (citation omitted); *see* 52 U.S.C. § 20507(i)(2) ("The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent . . . ."); *see also Jones v. Southpeak Interactive Corp. of De.*, 777 F.3d 658, 671 (4th Cir. 2015) (stating that "the term 'shall include' sets a floor, not a ceiling" and that "'[c]ourts have repeatedly indicated that 'shall include' is not equivalent to 'limited to'") (quoting *Long*, 682 F.3d at 337) (some quotation marks omitted).

Accordingly, the *Long* Court concluded that completed voter registration applications "fall within Section 8(i)(1)'s general disclosure mandate." 682 F.3d at 336.

## C.

Judicial Watch contends that the voter registration list is a "record" under Section 8(i). Plaintiff starts from the premise that an individual voter registration is a Section 8(i) record and therefore multiple voter registrations are Section 8(i) records as well. *See* ECF 52 at 9-10 (challenging defendants' "obviously wrong" reasoning that a single individual voter registration could be produced under Section 8(i), but two such records requested together could not). Because a voter list is derived from multiple voter registrations, plaintiff concludes that voter registrations are equivalent to a voter list. In essence, plaintiff reasons that if the voter registration for each voter on a voter list is a Section 8(i) record, then the voter list should be a Section 8(i) record as well. *Id.*

Defendants disagree. They acknowledge that election officials update MDVOTERS by making changes to individual voter registrations. *See, e.g.*, ECF 47-1 at 13 ("When an election official processes voter registration transactions, the official makes changes to individual records on a record-by-record basis."). But, they distinguish a voter list from a collection of individual voter registrations. A voter list, they contend, is "only a partial description of the contents of the database for each of the retrieved records[.]" ECF 49-1 at 21. The "voter list acts as an index that describes some of the contents of the database, but does not constitute the contents of the database for each of the retrieved entries." *Id.* at 22. Further, defendants maintain that the State does not use a "voter list" for programs, activities, or much of anything at all. ECF 49-1 at 18, 19-20. Instead, the State merely produces a voter list upon request by a Maryland voter. *Id.* at 20-21. The State's argument bottoms on the formal distinction between a voter list and the voter registrations

from which a list is derived. Therefore, the case turns on whether this distinction has legal significance.

To answer this question, I first consider whether voter registrations are Section 8(i) records. A voter registration consists of (1) voter data, containing the individual's personal information and registration status sorted into fields; (2) the images of the associated "transaction source documents"; and (3) an activity log that records the changes made to the voter data. Like the voter registration applications in *Long*, voter registrations are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). The process of creating, updating, and auditing registrations "is a 'program' . . . because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task . . . of [Maryland] election employees." 682 F.3d at 335 (quoting 42 U.S.C. § 1973gg-6(i)(1), *as amended*, 52 U.S.C. § 20507(i)(1)).

In Maryland, State and local officials rely on voter registrations to register new voters and to remove ineligible voters, thereby "'ensuring the accuracy and currency of official lists of eligible voters.'" *Long*, 682 F.3d at 335 (internal citation omitted). And, the voter registrations are clearly records that concern the implementation of the program and activity of maintaining accurate and current eligible voter lists. After all, they contain the information on which Maryland election officials rely to monitor, track, and determine voter eligibility. *See id.* at 336.

Indeed, the Fourth Circuit resolved this issue in *Long*, 682 F.3d at 337. It said, *id.*:

> The NVRA, including Section 8(i)(1), concerns voter registration, not simply voter removal. Notably, the statute is entitled the "National Voter *Registration* Act," and is codified under a subchapter designated "National Voter *Registration*[.]" Moreover, Section 8(i)(1) is located in a section titled

"Requirements with respect to administration of voter *registration*," and a subsection titled "Public disclosure of voter *registration* activities[.]" These statutory labels reinforce the conclusion that Section 8(i)(1) governs voter registration records. Because the NVRA requires disclosure of all materials described in Section 8(i)(1), *including voter registration records*, defendants must permit inspection of the completed applications, as instructed by the district court.

(Emphases in original) (internal citations omitted).

What, then, is a voter list, and how does it differ from a compilation of individual voter registrations?  Whereas a compilation of voter registrations contains voter data, transaction source documents, and an activity log for each voter, a voter list contains only the voter data for each voter.  In fact, a voter list contains only a subset of the voter data, including information, such as voter name and address, and excluding other information, such as a Social Security number.  Accordingly, a voter list is simply a pared down compilation of voter registrations.  Defendants provide a similar characterization: "The list is only a partial description of the contents of the [MDVOTERS] for each of the retrieved records; the database contains more information for each registered voter than is reflected on the voter list."  ECF 49-1 at 21.

The question is whether there is any legal significance to Judicial Watch's characterization of this information as a voter list, instead of a compilation of individual voter registrations.  The case of *Project Vote v. Kemp*, 208 F. Supp. 3d 1329 (N.D. Ga. 2016), provides guidance.  In that case, Project Vote requested that Georgia produce certain records pertaining to rejected voter registrations.   Georgia Secretary of State Brian Kemp claimed, "Plaintiff has consistently sought access to Defendant's Database . . . . However, to the extent that Plaintiff suggests that what it really seeks in this litigation is copies of documents maintained by election officials, Plaintiff has not provided Defendant with statutory notice[.]" *Id.* at 1347 (internal citation omitted) (alteration omitted). Kemp also argued that, "to the extent Plaintiff

now requests individual voter records, it failed to provide statutory notice." *Id.* (internal citation omitted).

However, the *Kemp* Court rejected this line of argument. It reasoned, *id.* at 1348:

> Defendant does not provide any support for its position that Plaintiff was required to detail in its written notice the format of the documents it sought, or the specific type of documents that would satisfy its request. Indeed, courts have found that an NVRA notice is sufficient if it "sets forth the reasons for [the] conclusion" that a defendant failed to comply with the NVRA, and, when "read as a whole, [it] makes it clear that [the plaintiff] is asserting a violation of the NVRA and plans to initiate litigation if its concerns are not addressed in a timely manner." *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012). This interpretation is consistent with the purpose of the notice provision, which "is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." [*Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012)].

I am persuaded by the *Kemp* Court's focus on the information sought rather than the particular language used to characterize that information. Here, Judicial Watch seeks the "most recent voter registration database from Montgomery County, Maryland, including fields indicating name, date of birth, home address, most recent voter activity, and active or inactive status." ECF 1-1 at 5. Defendants were provided notice that plaintiff seeks this information. And, whether plaintiff characterized its request as one seeking a "voter registration database," a "voter list," or "individual voter registrations," defendants are well aware of the type of records that could satisfy Judicial Watch's request.

If Judicial Watch had submitted requests for voter registration data, corresponding to the thousands of Montgomery County voters, the State would have been required to produce each record, pursuant to Section 8(i). Instead, Judicial Watch merely submitted a single request for a voter list containing and compiling the same information about the thousands of voters in Montgomery County. Although both scenarios seek the same information,

defendants believe that the NVRA would require compliance with only one of them.[6] Rejecting Judicial Watch's request based on semantics would be tantamount to requiring Judicial Watch to make thousands of separate requests. Neither the NVRA, the Court, nor common sense can abide such a purposeless obstruction.

And, this is particularly true because defendants can easily produce the requested voter list. Indeed, in Judicial Watch's Notice Letter, it requests "[c]opies of the most recent voter registration database from Montgomery County, Maryland, including fields indicating name, date of birth, home address, most recent voter activity, and active or inactive status." *See* ECF 1-1 at 5. With the exception of date of birth, a party can request this information through the State's "Application for Voter Registration Data." *See* ECF 49-7. In fact, the State concedes that, "except for the voter's date of birth, all of the information requested by plaintiff is available via request for a voter list under Elec. Law § 3-506." ECF 49-1 at 38.

Nevertheless, defendants maintain that "plaintiff's attempt to reframe its request as one for 'individual records' . . . proves too much." ECF 53 at 3. They assert that even under plaintiff's own framing, plaintiff would be entitled only to the "records associated with the database entries on which election officials conducted 'voter list maintenance' *in the last two years*." *Id.* (emphasis added).

Defendants seem to believe they need only produce records it used in the last two years because Section 8(i)(1) states: "*Each State shall maintain for at least 2 years* and shall make available for public inspection and, where available, . . . all records concerning the implementation of programs and activities . . . ." 52 U.S.C. § 20507(i)(1). But, defendants misunderstand the

---

[6] I leave open for now the issue of E.L. § 3-506, which defendants believe would free them from complying with the NVRA in either circumstance.

statute. It does not provide that a state need not produce a record if it is over two years old. Rather, the statute provides that a state must retain the applicable records for at least two years. Accordingly, if a state chooses to retain a record beyond two years, the NVRA requires the state to produce that record. Accordingly, Maryland must produce an individual voter registration, irrespective of its age, provided that it "concern[s] the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

Defendants insist that a voter list is not a "record" under Section 8(i). They argue that it is tantamount to a descriptive "listing or index" of the type rejected in *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233 (D.D.C. 2012). ECF 49-1 at 17-18, 24-25. In their view, such a "listing or index" would not be "based on a particular search," but rather would be a "new record" and therefore outside the scope of Section 8(i). *Id.* at 24-25, 29.

In *National Security Counselors*, 898 F. Supp. 2d 233, a non-profit challenged the refusal of the Central Intelligence Agency ("CIA") to turn over records in response to plaintiff's request under the Freedom of Information Act ("FOIA"). Among these were "(1) a request for 'database listings of all FOIA requesters from Fiscal Years 2008-2010 according to the fee categories to which CIA assigned them,' and (2) a request for 'a record that would indicate the ten individuals responsible for the most FOIA requests submitted (each) in Fiscal Years 2008, 2009, and 2010.'" *Id.* at 268-69. The CIA declined to produce these records because its "record systems are not configured in a way that would allow [it] to perform a search reasonably calculated to lead to the responsive record without an unreasonable effort.'" *Id.* at 245. The CIA contended that "processing requests for database listings would (a)

require it to create new records, as opposed to merely producing preexisting records and/or (b) require it to conduct research, as opposed to merely performing a search." *Id.* at 269.

Ultimately, the court sided with the CIA, finding that, while "an agency need not create a new database or a reorganize its method of archiving data," searches or sorting of a pre-existing electronic database do "not involve the creation of a new record." *Id.* at 270. The court explained that "[s]orting a database by a particular data field (*e.g.*, date, category, title) is essentially 'the application of codes or some form of programming,' and thus does not involve creating new records or conducting research—it is just another form of searching that is within the scope of an agency's duties in responding to FOIA requests." *Id.* (quoting H.R. Rep. No. 104-795, at 22 (1996)).

As discussed, the Maryland State Board of Elections relies on a standardized form (ECF 49-7) for third-parties to request voter lists, like the one requested by Judicial Watch. *See* ECF 49-1 at 38 ("[E]xcept for the voter's date of birth, all of the information requested by plaintiff is available via request for a voter list under Elec. Law § 3-506."). Therefore, the production of the requested list amounts to little more than "'the application of codes or some form of programming.'" *Nat'l Security Counselors*, 898 F. Supp. 2d at 270 (quoting H.R. Rep. No. 104-795, at 22 (1996). Further, there is no contention that satisfying the request would be unduly burdensome. *See Nat'l Security Counselors*, 898 F. Supp. 2d at 271 n. 26 ("The E–FOIA Amendments . . . stat[ed] that when an agency responds to a FOIA request, it 'shall make reasonable efforts to search for the records in electronic form or format[.]'") (quoting The Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, § 5, 110 Stat. 3048, 3050); *see also id.* at 271 n.26 ("[I]f a FOIA request for 'aggregate data' would

require an unreasonably burdensome electronic search within the confines of an agency's automated information system, an agency need not conduct the search.").

Last, defendants contend that construing a voter list as a Section 8(i) record would result in "the circular and, on its face, nonsensical construction that the *voter list* is a record concerning the implementation of a program and activity undertaken to ensure the accuracy of the *voter list*." ECF 49-1 at 30 (emphases in original). But, defendants are again quibbling over semantics. One need only remember that a "voter list" is simply a partial compilation of voter registrations to see that there is nothing "nonsensical" about this construction: "Each State . . . shall make available for public inspection all [voter registration] records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

### D.

### 1.

As noted, under E.L. § 3-506(a)(1), defendants claim that because Judicial Watch is not a Maryland voter, it is not entitled to the State's voter registration list. ECF 49-1 at 22. The State law provides that, upon request, a "copy of a list of registered voters shall be provided to a Maryland registered voter." E.L. § 3-506(a)(1). In response, Judicial Watch maintains that E.L. § 3-506(a)(1) is preempted by Section 8(i) of the NVRA. ECF 43-1 at 22-24. Specifically, Judicial Watch asserts that the State law is subject to field preemption, conflict preemption, and obstacle preemption, which is a specific type of conflict preemption. *Id.*

But, defendants counter that the NVRA's "public inspection" provision does not conflict with Maryland election laws, because "nothing in the NVRA precludes Maryland from imposing reasonable limitations around the public inspection that it provides." ECF 49-1 at 34. In their

view, the limitation is justified because "Maryland voters bear the greatest risk that Maryland registered voter lists will be misused for commercial gain, and are also the persons who are most directly impacted by the accuracy and integrity of such lists." *Id.*

"Federal law may preempt state law under the Supremacy Clause in three ways—by 'express preemption,' by 'field preemption,' or by 'conflict preemption.'" *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (citation omitted); *see also Decohen v. Capital One, N.A.*, 703 F.3d 216, 223 (4th Cir. 2012). These three types of preemption are forms of "ordinary preemption" that serve as federal defenses to a state law claim. *Lontz v. Tharp*, 413 F.3d 435, 441 (4th Cir. 2005); *see Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014).

Ordinary preemption "regulates the interplay between federal and state laws when they conflict or appear to conflict[.]" *Decohen*, 703 F.3d at 222; *see Murphy v. NCAA*, 584 U.S. ___, 138 S. Ct. 1461, 1476 (2018). "[S]tate law is naturally preempted to the extent of any conflict with a federal statute," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), because the Supremacy Clause of the Constitution, U.S. CONST. art. VI, cl. 2, provides that a federal enactment is superior to a state law. As a result, pursuant to the Supremacy Clause, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted); *see also Merck Sharp & Dohme Corp. v. Albrecht*, ___ U.S. ___, 2019 WL 2166393, at *8 (May 20, 2019) (discussing impossibility or conflict preemption, and reiterating that "'state laws that conflict with federal law are without effect,'" but noting that the "'possibility of impossibility [is] not enough'") (citations omitted); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013); *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 475 (4th Cir. 2014) ("The Supreme Court has held that state and federal law conflict when it is impossible for a private

party to simultaneously comply with both state and federal requirements.[] In such circumstances, the state law is preempted and without effect.")

"Federal preemption of state law under the Supremacy Clause—including state causes of action—is 'fundamentally . . . a question of congressional intent.'" *Cox v. Duke Energy, Inc.*, 876 F.3d 625, 635 (4th Cir. 2017) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)); *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9 (2003). Congress manifests its intent in three ways: (1) when Congress explicitly defines the extent to which its enactment preempts state law (express preemption); (2) when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and (3) when state law "actually conflicts with federal law" (conflict or impossibility preemption). *English*, 496 U.S. at 78-79; *see Sara Lee Corp.*, 508 F.3d at 191; *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 109 (1992) (describing field preemption as existing "where Congress creates a scheme of federal regulation so pervasive as to leave no room for supplementary state regulation").

Obstacle preemption is a type of conflict preemption. *Sara Lee Corp.*, 508 F.3d at 191-92. It applies "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Typically, obstacle preemption arises when a state law "interferes with the methods by which the federal statute was designed to reach [its] goal." *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010) (citing *Gade*, 505 U.S. at 103) (internal quotations and citations omitted). Obstacle preemption "requires the court independently to consider national interests and their putative conflict with state interests," and so "is more an exercise of policy choices by a court than strict

statutory construction." *Columbia Venture, LLC*, 604 F.3d at 830 *(quoting Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1113 (4th Cir. 1988)).

Generally, a court presumes that Congress did not intend to preempt state law unless it was Congress's clear purpose to do so. *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). But, this is not so with Elections Clause legislation, such as the NVRA. *Inter Tribal*, 570 U.S. at 14. This view is predicated on the text of the Elections Clause, which provides U.S. Const. Art. I, § 4, cl. 1: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators."

The Elections Clause "empowers Congress to 'make or alter' state election regulations[,]" and therefore the "assumption that Congress is reluctant to pre-empt does not hold when Congress acts" under that Clause. *Inter Tribal*, 570 U.S. at 14; *see Harkless v. Brunner*, 545 F.3d 445, 455 (6th Cir. 2008) (The rule "that Congress must be explicit when it encroaches in areas traditionally within a state's core governmental functions [] does not apply when Congress acts under the Elections Clause, as it did in enacting the NVRA") (citations omitted). Instead, when considering Elections Clause legislation, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Inter Tribal*, 570 U.S. at 14; *see id.* at 15 ("[T]here is no compelling reason not to read Elections Clause legislation simply to mean what it says.").

In several cases, courts have concluded that the NVRA preempts state law in different contexts. One example is an NVRA provision that preempts state laws requiring proof of citizenship by requiring states to "accept and use" the federal registration form. *See Inter Tribal*,

570 U.S. at 11-13; *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (concluding that Georgia law prohibiting anyone other than registrars or authorized personnel from accepting voter registrations was preempted by NVRA's provision regarding mailed applications); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (E.D. Ohio 2006) (compelling "voter registration workers who are compensated" to "pre-register with the [Ohio] Secretary of State, undergo an 'online-only' Internet training program, and submit" a special affirmation is not uniform and non-discriminatory as required by 52 U.S.C. § 20507(b)(1)).

As noted, Congress expressly stated that the NVRA has four purposes: to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance[] the participation of eligible citizens as voters in elections for Federal office," *id.* § 20501(b)(2); "to protect the integrity of the electoral process," *id.* § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4). Section 8(i) of the NVRA provides for the disclosure of voter registrations in order to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Long*, 682 F.3d at 339. But, E.L. § 3-506(a) limits that disclosure to Maryland voters, thereby excluding organizations and citizens of other states from identifying error and fraud.

Defendants maintain that E.L. § 3-506(a) is a "reasonable limit." They argue that "Maryland has determined that the risks associated with disclosure of its registered voters' personal information, when compiled in the form of a list of registered voters, were such that disclosure should be made only to persons who bear those same risks—*i.e.*, to registered Maryland voters." ECF 53 at 10. But, defendants reveal the emptiness of this rationale when they later claim that "Elec. Law § 3-506(a) . . . does not preclude the recipient from sharing the list with other

persons who do not meet Maryland's registered voter requirement." ECF 53 at 11. That is, a Maryland voter may request and obtain a voter list and immediately transfer it to Judicial Watch. Consequently, E.L. § 3-506(a) does not advance a valid state interest. Rather, it obstructs the effective implementation of Section 8(i) and hinders the realization of the NVRA's enumerated purposes.

Organizations such as Judicial Watch and Project Vote have the resources and expertise that few individuals can marshal. By excluding these organizations from access to voter registration lists, the State law undermines Section 8(i)'s efficacy. Accordingly, E.L. § 3-506(a) is an obstacle to the accomplishment of the NVRA's purposes. It follows that the State law is preempted in so far as it allows only Maryland registered voters to access voter registration lists.[7]

Because I conclude that E.L. § 3-506(a) is subject to obstacle preemption, I need not consider field preemption or other types of conflict preemption.

**2.**

The parties dispute whether Judicial Watch is entitled to the date of birth of each Montgomery County voter. Judicial Watch maintains that "birthdate information enhances the ability of an investigator to detect duplicate registrations as well as registrations containing age information that is suspect." ECF 52 at 24. Defendants contend that "the disclosure of date of birth in conjunction with a person's name enhances the risk of identity theft." ECF 49-1 at 20; *see also* ECF 53 at 11-12; ECF 53-1.

---

[7] In *Fusaro v. Cogan*, 930 F.3d 241, ___ (4th Cir. 2019), the Fourth Circuit recognized that E.L. § 3-506 implicates First Amendment considerations, as a voter registration list "is a means of political communication, and the combined effect of the content- and speaker-based restrictions contained in § 3-506 present a sufficient risk of improper government interference with protected speech that [plaintiff] may challenge § 3-506 in federal court." (Alteration added). However, in this case plaintiff has not asserted a First Amendment challenge to E.L. § 3-506,

In this era of "big data" and massive data breaches, and the rampant misuse of personal identifying information, defendants' privacy concern seems legitimate. *True the Vote*, 43 F. Supp. 3d at 738 ("Identity theft is an ever-growing concern in this nation in the 'age of big data' and is fueled by the disclosure, whether intentionally or inadvertently, of personal information such as birthdates. Corporate tightening of security in response to recent major data breaches, and the news coverage surrounding those breaches, are evidence of the public's concern.").

The parties' limited briefing on this issue is inadequate, however. Accordingly, at this time, the Court is not prepared to order defendants to produce the birthdates of thousands of Maryland voters. But, I will allow the parties to brief this issue more fully. In doing so, the parties should be sure to address whether the Fourth Circuit's decision in *Long*, 682 F.3d at 339, is controlling here. *See also Project Vote/Voting for Am., Inc. v. Long*, 889 F. Supp. 2d 778, 781 (E.D. Va. 2012).

### 3.

In the Complaint (ECF 1, ¶ 32), plaintiff also alleged that other parts of E.L. § 3-506(a) conflict with Section 8(i) of the NVRA by:

a. requiring a written application to acquire a voter list;

b. requiring a statement under oath about the intended use of the voter list, including that it will not be used for any purpose not related to the electoral process;

c. permitting the State Board of Elections to regulate the authorization required for providing a voter list;

d. permitting the State Board of Elections to establish a fee for providing a list (rather than merely a reasonable fee for copying a list); and

e. permitting the State Board of Elections to specify the information to be provided with a voter list.

However, plaintiff now challenges only the State Board's "unlimited authority to limit 'the information to be provided with a voter list,' and in particular birthdate data." ECF 52 at 21 n. 8. It contends that none of the other provisions have "become an issue in this case." *Id.* at 21. Indeed, Judicial Watch has stated that it will "pay any standard fee." ECF 43-6, ¶ 12. It also claims that it "has no interest in using Montgomery County's registration list for commercial purposes." *Id.* But, defendants note that E.L. § 3-506(c) prohibits the data "'to be used for any purpose not related to the electoral process.'" ECF 53 at 11 (quoting E.L. § 3-506(c)). And, there are non-commercial purposes that are unrelated to the electoral process.

Nevertheless, Judicial Watch does not assert that these State laws are preempted, except as to the date of birth. Therefore, Judicial Watch has established entitlement to the voter registration list, subject to compliance with the relevant State law.

## IV.    Conclusion

For the foregoing reasons, Judicial Watch is entitled to the voter registration list for Montgomery County that includes fields indicating name, home address, most recent voter activity, and active or inactive status. Therefore, I shall grant in part and deny in part the Motion (ECF 43), and I shall deny the Cross Motion (ECF 49). An Order follows.

Date:  August  8, 2019

_____/s/_____<br>
Ellen Lipton Hollander<br>
United States District Judge